Reed, J.
The question presented in this case for determination is of very grave importance,—purely a question of law; there was no controversy in regard to the facts. The testimony in this case establishes the facts that, prior to the inception of the scheme to construct the ditch of the defendant in error, and prior to January 1,1876, water from the stream had been legally appropriated exceeding in volume 2300 cubic feet per second, while the volume of the stream for the irrigating season of 1888 did not average over 700 cubic feet per second. Perhaps that season was an ex *55 ceptionally dry one, but it is not so shown. The canal in question, at its easterly extremity, 60 miles in a desert from the source of supply, was built in 1885 or later; and taking the testimony of the defendant in error as true, that that section of the country is absolutely uninhabitable unless supplied with water for domestic purposes from the canal, we must conclude that the settlers for whose use water was required in this suit settled in those years, as, from the facts shown, such settlements could not have antedated the completion of the canal, from absolute lack of water to sustain animal life. Here we find, at a time when the stream was not supplying to those who had legally appropriated the water from 10 to. 25 years before to exceed one third of the supply adjudicated and decreed, the defendant in error applying to the courts for a further reduction and diversion for the benefit of the latest comers. All such attempts, especially when successful, are subversive of natural and statutory law and rights and the constitution of the state, and could not possibly be tolerated in a court of equity except upon the ground of the inexorable necessity of having water to sustain human life. On no other ground could the original plaintiff have had any standing in a court of equity.
The question to be determined is, did the court err in decreeing the right of defendant in error to divert the water of the stream for distribution to settlers and patrons for domestic use, paramount and superior to the rights of those who had appropriated the same water for purposes of irrigation ?
In examining the right to the use of water for domestic purposes, under the facts of this case, and under the climatic and physical conditions incident to an arid, semi-desert country, very little assistance can be obtained from common-law sources, or the adjudications of older states where the same conditions do not exist. Doctrines of common law declaratory of the rights of riparian proprietors have very limited, if any, application. Before any general organization, territorial or otherwise, was or could have been had, a tide of *56 emigration poured into the region comprised in the present state, and over the entire west. It was found an arid, semi-desert country. The land could only be made productive by the artificial use of water. The country was without law, but each individual brought with him the principles of equity and justice which were a part of his education. It was soon found that the water of the streams was inadequate to supply all the land. They found a new climate, new conditions calling for new laws applicable to the conditions. The first comer settled near the stream. In the absence of surveys he designated by landmarks the boundaries and extent of his occupation of land. He diverted—appropriated by such diversion—a certain amount of water from the stream, supposed to be sufficient. Others settled near him upon the same stream, and made a like appropriation. In time there were agricultural settlers enough to organize and establish a local government, and a series of rules or laws were adopted, perhaps in many instances crude and inartificially drawn, but embodying principles of equity and justice. They were recognized and obeyed, the settlers recognizing, as before stated, a fact which later corporations and settlers have not yet apparently recognized, or, if recognized, have disregarded, that the supply of water in the streams was not sufficient for all the land. Instead of parceling it out generally and making it practically valueless to any, following the course of California and other earlier settled territories where the same conditions existed, they adopted the only rule founded in equity that could be rightfully adopted in the premises, viz., that of prior appropriation, such appropriation to be controlled and limited. Such prior appropriation was so much as could be beneficially used upon the land for which the appropriation was made. This was the general, well-regulated custom, hence a law, prior to and at the time of the organization of the territory; and, in the organic act creating the territory, it is said, (section 6:) “Nor shall any law be passed impairing the rights of private property.”
The right to water by prior appropriation was recognized *57 by the first legislature of the territory, (see Laws 1861, p. 67,) and such rights continued to be recognized during the entire territorial existence. The general government, ini which was the fee to both land and water at the time of the' settlement, and for many years after, acquiesced in the disposition of the water according to local customs, and, in July, 1866, passed an act in which it provided (section 9) “ that, whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same.” The. right to the water in the streams of Colorado, by prior appropriation, antedated any legislation. It was the common law of the people, and legislation, both national and territorial, was but a recognition declaratory of the right as it had theretofore and then existed. Neither in any territorial or national legislation do we find any provision or declaration of rights to water by appropriation, or to be acquired in any other manner, for domestic use. It is first found in the constitution of the state. , •
Although water for domestic purposes is a necessity, and its use for that purpose a primary use, it seems that, from the small quantity required, and its use so inconsiderable compared with the quantity required for irrigation, it was regarded as incidental. Article 16, § 5, is as follows: “ The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided.” And article 16, § 6: “ The right to divert unappropriated waters of any natural stream for beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but, when the waters of any natural stream are not sufficient for the service of all those desiring the use *58 of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes.”
The error into which the learned judge seems to have fallen was in regarding these constitutional provisions as retrospective, and so far retroactive as to impair, if not destroy, property rights acquired long before its adoption. Such cannot be its construction. It must be construed to be declaratory of, and not destructive of, the rights and powers enjoyed by the people before its adoption. In the language of Mr. Webster, the great expounder of constitutional law: “ Written constitutions sanctify and confirm great principles, but the latter are prior in existence to the former.” 2 Webst. Works, 392.
In Hamilton v. County Court, 15 Mo. 13, it is said: “ What is a constitution, and what are its objects ? It is easier to tell what it is not than what it is. It is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause? but consequence, of personal and political freedom ; it grants no rights to the people, but is the creature of their power, the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers which they possessed before the constitution was made, it is but the frame-work of the political government, and necessarily based upon the pre-existing conditions of laws, rights, habits, and modes of thought.” And the language is quoted and adopted by Judge Cooley. Const. Lim. 47."
And in regard to water rights by prior appropriation the supreme court of this state has asserted the same general principle in Coffin v. Ditch Co., 6 Colo. 446, in terse and comprehensive language, where it is said: “ The right itself and the obligation to protect it existed prior to legislation on the *59 subject of irrigation.” See, also, Strickler v. City of Colorado Springs, 16 Colo. 61.
By section 5 it will be seen that the prior appropriations of water were recognized, and in no way attempted to be affected, by the provisions of the constitution. The language is, “ the water of every natural stream, not heretofore appropriated, * * * is hereby declared to be the property.of the public,” etc., and, by section 6, “ the right to divert any un-, appropriated waters of any natural stream,” etc., clearly showing that the provisions of the constitution were only to operate in the future, and only upon the water that was unappropriated at the time of their adoption. It is a well-settled, rule of construction that all parts of an instrument are to be construed together, and harmonized if possible. To give the clause of section 6 the construction claimed would not only make it contradictory to the first part of the same section, but contradictory of section 5, and directly in conflict with section 15 of article 2, (bill of rights,) which declares’ “ that private property shall not be taken or damaged for public or private use without just compensation.”
It follows from what has been said that the court erred in construing the section of the constitution as authorizing an interference, impairment, or injury of the rights of prior appropriators for irrigating purposes vested before the adoption of the constitution, for the purpose of supplying water for domestic purposes to later comers. See Strickler v. City of Colorado Springs, supra. The suit as made should have been at once dismissed for want of equity. The right to the use of water is property; the title accrues by legal appropriation, and becomes vested as of the date of such appropriation. To divest such right and confer it upon another without compensation would be clearly an infraction of constitutional guaranties, and the inequitable character of the decree becomes at once apparent.
For the reasons above stated the decree should be reversed, and the suit dismissed.

Reversed.